**ARENSON, DITTMAR & KARBAN**
AVI MERMELSTEIN (N.J. ATTORNEY ID# 907892012)
420 Lexington Avenue, Suite 1402
New York, NY 10170
Tel: (212) 490-3600
Attorneys for Plaintiffs and the Putative Class

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------------------------X

GEORGINA HERNANDEZ, ADRIAN CORTES, JOSE LUIS SANCHEZ, JERSON CRUZ, DELMYS AGUILAR, and ABELARDO PASTRANA , on behalf of themselves and all others similarly situated who were employed by Supershine Car Wash, LLC, Larry Engel, Eric Engel and Samuel Engel,

<u>Civil Action</u>

PLAINTIFFS,

Case No.:

-  against –

Jury Trial Requested

SUPER SHINE, L.L.C. LIMITED LIABILITY COMPANY, LARRY ENGEL, ERIC ENGEL, SAMUEL ENGEL, ENGEL INVESTMENTS, LLC, ENGEL PROPERTIES LLC, ENGEL HOMES, LLC, GRAND MANAGEMENT GROUP, LLC and ENGEL GARDENS, LLC,

DEFENDANTS.
------------------------------------------------------------------------X

## <u>COLLECTIVE AND CLASS ACTION COMPLAINT</u>

1.      Plaintiffs Georgina Hernandez ("Hernandez"), Adrian Cortes ("Cortes"), Jose Luis Sanchez ("Sanchez"), Jerson Cruz ("Cruz"), Delmys Aguilar ("Aguilar"), and Abelardo Pastrana ("Pastrana") (collectively, the "Named Plaintiffs"), individually and on behalf of the putative collective and class and the proposed subclass (collectively, "Plaintiffs"), by and through their attorneys Arenson, Dittmar, and Karban, and as for their Complaint against Defendants Super Shine, L.L.C. Limited Liability Company ("Super Shine"), Engel Investments, LLC ("Engel

Investments"), Engel Properties LLC ("Engel Properties"), Engel Homes, LLC ("Engel Homes"). Grand Management Group, LLC ("Grand Management") and Engel Gardens, LLC ("Engel Gardens") (collectively the "Corporate Defendants"), Larry Engel ("Larry"), Eric Engel ("Eric") and Samuel Engel ("Sam") (collectively the "Individual Defendants"; together with Corporate Defendants, "Defendants"), upon personal knowledge as to themselves and upon information and belief, allege as follows:

## NATURE OF THE ACTION

2.      This action chiefly arises out of Defendants' failure to pay Plaintiffs overtime compensation, the minimum wage, and other monies, as required by the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. ("FLSA"), and the New Jersey Wage and Hour Law, N.J.S.A. §§ 34:11-56a4 *et seq*. ("NJWHL").

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

4.      This Court is empowered to issue declaratory relief under 28 U.S.C. §§ 2201 and 2202.

5.      Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b), because all or a substantial part of the events or omissions giving rise to the claims occurred in the District of New Jersey.

## **PARTIES**

6.      During the relevant period, April 9, 2018, to date, Defendants Larry Engel and his sons, Eric Engel and Sam Engel, have owned, operated and controlled Super Shine Car Wash in Elizabeth, New Jersey.

7.       During the relevant period, Super Shine and the Individual Defendants have employed over 100 workers.

8.      During the relevant period, Defendants Larry, Sam and Eric also have owned, operated and controlled a number of real estate companies, including, without limitation, Engel Investments, Engel Properties, Engel Homes, Grand Management, and Engel Gardens.

9.      Plaintiffs are individuals residing in the State of New Jersey who were or are employees of Super Shine and the Individual Defendants.

10.     Upon information and belief, Defendant Super Shine is a business incorporated in the State of New Jersey, with its principal place of business at 415 N Broad St., Suite B, Elizabeth, NJ 07208.

11.     Upon information and belief, at all relevant times, Defendant Super Shine has had gross sales or business in excess of $500,000 annually.

12.     Upon information and belief, the Defendant Super Shine is engaged in interstate commerce.

13.     Upon information and belief, Defendant Engel Investments, LLC is a New Jersey domestic limited liability company whose address is 415 N Broad St., Suite B, Elizabeth, NJ 07208.

14.    Upon information and belief, at all relevant times, Defendant Engel Investments, LLC has had gross sales or business in excess of $500,000 annually.

15.    Upon information and belief, Defendant Engel Investments, LLC is engaged in interstate commerce.

16.    Upon information and belief, Defendant Engel Properties LLC is a New Jersey domestic limited liability company whose address is 415 N Broad St., Suite B, Elizabeth, NJ 07208.

17.    Upon information and belief, at all relevant times, Defendant Engel Properties LLC has had gross sales or business in excess of $500,000 annually.

18.    Upon information and belief, Defendant Engel Properties LLC is engaged in interstate commerce.

19.    Upon information and belief, Defendant Engel Gardens, LLC is a New Jersey domestic limited liability company whose address is 415 N Broad St., Suite B, Elizabeth, NJ 07208.

20.    Upon information and belief, at all relevant times, Defendant Engel Gardens, LLC has had gross sales or business in excess of $500,000 annually.

21.    Upon information and belief, Defendant Engel Gardens, LLC is engaged in interstate commerce.

22.    Upon information and belief, Defendant Grand Management Group, LLC is a New Jersey domestic limited liability company whose address is 415 N Broad St., Suite B, Elizabeth, NJ 07208.

23.    Upon information and belief, at all relevant times, Defendant Grand Management Group, LLC has had gross sales or business in excess of $500,000 annually.

24.     Upon information and belief, Defendant Grand Management Group, LLC is engaged in interstate commerce.

25.     Upon information and belief, Defendant Engel Homes, LLC is a New Jersey domestic limited liability company whose address is 618 Westfield Avenue, Elizabeth, NJ 07208.

26.     Upon information and belief, at all relevant times, Defendant Engel Homes, LLC has had gross sales or business in excess of $500,000 annually.

27.     Upon information and belief, Defendant Engel Homes, LLC is engaged in interstate commerce.

28.     Upon information and belief, Defendant Larry Engel is a resident of the State of New Jersey and is, or has been during the relevant period, an owner and operator, in whole or in part, of Super Shine, Engel Investments, Engel Homes, Engel Properties, Grand Management, and Engel Gardens.

29.     Upon information and belief, Defendant Eric Engel is a resident of the State of New Jersey and is, or has been, during the relevant period, an owner and operator, in whole or in part, of Super Shine, Engel Investments, Engel Homes, Engel Properties, Grand Management, and Engel Gardens.

30.     Upon information and belief, Defendant Samuel Engel is a resident of the State of New Jersey and is, or has been, an owner and operator, in whole or in part, of Super Shine, Engel Investments, Engel Homes, Engel Properties, Grand Management, and Engel Gardens.

31.     Defendant Super Shine, the Individual Defendants and Defendants Engel Investments, Engel Properties, Grand Management, and Engel Gardens, were, and continue to be, an integrated enterprise and/or a single employer.

32.     Among other things, the Individual Defendants have used, and continue to use workers who worked at Super Shine, including but not limited to Named Plaintiffs Cortes and Cruz, to perform work for their real estate companies at the buildings and construction sites they owned, operated and controlled.

33.     The Individual Defendants directed and controlled the work of the workers at Super Shine and the work of the workers at Defendants Engel Investments, Engel Properties, Grand Management, and Engel Gardens, either directly or through their agents.

34.     One or more of the Individual Defendants drove workers, including but not limited to, Named Plaintiffs Cortes and Cruz, from the car wash to the buildings and construction sites they and their companies owned.

35.     As set forth below, the workers who were brought from the car wash to the buildings and construction sites owned by the Defendants, were paid for their work at Defendants' buildings and construction sites at the same hourly rate and in the same manner as they were paid for the hours they worked at Super Shine.

36.     Defendants Engel Investments Engel Properties, Engel Homes, Grand Management, and Engel Gardens maintain their corporate offices at the same address as Defendant Super Shine: 415 N Broad St Suite B, Elizabeth, NJ 07208.

37.     Tenants of the buildings owned by the Individual Defendants and Defendants Engel Investments, Engel Properties, Grand Management, and Engel Gardens pay their monthly rent at Super Shine to the cashier employed by Super Shine and the Individual Defendants.

## COLLECTIVE ALLEGATIONS

38.     Named Plaintiffs bring the first claim for relief against Defendants as a collective action pursuant to the F.L.S.A., 29 U.S.C. § 216(b), on behalf of themselves and all other similarly-

situated current and former non-exempt employees who have worked and/or continue to work for Super Shine and the Individual Defendants at any time during the three years prior to the filing of this action through the entry of judgment in this action (the "FLSA Collective").

39.     At all relevant times, and as set forth more specifically below, the Named Plaintiffs and the FLSA Collective have been similarly situated, have been governed by similar pay practices and have been subjected to Super Shine's and the Individual Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in Super Shine's and the Individual Defendants' willful failure and refusal to pay the Named Plaintiffs overtime compensation required by the FLSA.

40.     Super Shine and the Individual Defendants are liable under the FLSA for failing to properly compensate the FLSA Collective, and as such notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

41.     The FLSA Collective consists of numerous similarly situated current and former employees of Super Shine and the Individual Defendants, who were subject to the conduct complained of herein and who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the action. Those similarly situated employees are known to Super Shine and the Individual Defendants, are readily identifiable, and can be located through Super Shine's and the Individual Defendants' records.

## CLASS ALLEGATIONS

42.     This action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

43.     The proposed class consists of all employees of Super Shine and the Individual Defendants who have performed or will perform non-managerial work at Super Shine Car Wash

during the six years prior to the filing of this action through the entry of judgment in this action (the "Putative Class").

44.     Named Plaintiffs Hernandez, Cortes, Sanchez, Cruz, Aguilar and Pastrana are members of the Putative Class and seek to represent it.

45.     In addition, Plaintiffs Cortes, Sanchez, Cruz, Aguilar and Pastrana also seek to represent a subclass consisting of employees of Super Shine and the Individual Defendants who have performed or will perform non-managerial work at Super Shine Car Wash during the six years prior to the filing of this action through the entry of judgment in this action and whose stated hourly rates were at or below the applicable NJ minimum wage (the "Minimum Wage Subclass").

46.     The Subclass Representatives are each a member of the NJ Minimum Wage Subclass.

47.     The Putative class and the proposed Minimum Wage Subclass are each so numerous that joinder of all members is impracticable.

48.     The precise size of the Putative Class and the proposed Minimum Wage Subclass is unknown to Plaintiffs. The facts on which the calculation of that number can be based are presently within the sole control of Super Shine and the Individual Defendants. In addition, the names of all potential members of the Putative Class and the proposed Minimum Wage Subclass are not known to Plaintiffs.

49.     Upon information and belief, the size of the Putative Class exceeds 40 individuals.

50.     Upon information and belief, the size of the proposed Minimum Wage Subclass exceeds 40 individuals.

51.    The questions of law and fact common to the Putative Class and the proposed Minimum Wage Subclass predominate over any questions affecting only individual members. Such questions include:

a.  Whether Super Shine and the Individual Defendants failed to pay members of the Putative Class overtime compensation, at the rate at one-and-one-half times their regular rate for all hours worked in excess of 40 per week, pursuant to the NJWHL;

b.  Whether Super Shine and the Individual Defendants failed to pay members of the proposed Minimum Wage Subclass the minimum wage, pursuant to the NJWHL;

c.  Whether Super Shine and the Individual Defendants failed to pay members of the Putative Class and the proposed Minimum Wage Subclass for the "off-the-clock" work they performed after their official shift ended;

d.  Whether Defendants constitute an integrated enterprise and/or single employer;

e.  Whether Super Shine and the Individual Defendants failed to adhere to the recordkeeping requirements of the NJWHL and applicable regulations;

f.  Whether Defendants are liable for damages claimed hereunder, including but not limited to compensatory damages, interest, liquidated damages, costs, disbursements, and attorneys' fees; and

g.  Whether Defendants should be enjoined from engaging in such practices in the future.

52.    The claims of the Class Representatives are typical of the claims of the Putative Class.

53.    The claims of the Subclass Class Representatives are typical of the claims of the putative class.

54.     The Class Representatives and their counsel will fairly and adequately protect the interests of the putative class.

55.     The Subclass Representatives and their counsel will fairly and adequately protect the interests of the Subclass.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Besides the predominance of questions common to the Putative NJ Class and the NJ Minimum Wage Subclass, individual Class members lack the resources to undertake the burden and expense of individual prosecution of these claims against Defendants, especially in comparison with some of the maximum individual recoveries to which each class member would be entitled.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by legal and factual issues in this case. It also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

## STATEMENTS OF FACTS

### FACTS COMMON TO PLAINTIFFS

57.     Upon information and belief, since approximately 2010, the Super Shine and Individual Defendants have employed numerous individuals as car washers, cleaners, driers, detailers, and other occupations related to the business of the washing and cleaning of automobiles.

58.     Upon information and belief, the Individual Defendants have made the decisions for Defendant Super Shine, including decisions regarding hiring, firing, payment of wages,

assignment and scheduling of work, contractual matters, and all other administrative and company policy matters, either directly or through agents.

59.    Plaintiffs regularly were required by Super Shine and the Individual Defendants to perform work without receiving proper overtime compensation as required by applicable federal and state law.

60.    Upon information and belief, Super Shine and the Individual Defendants have maintained records of Plaintiffs' employment and pay, either directly or through agents.

61.    Upon information and belief, the Individual Defendants have actively managed, supervised, and directed, and continue to actively manage, supervise, and direct the business and operations of the Corporate Defendants either directly or through agents.

62.    By way of example only, Defendant Larry Engel has often told workers to work faster, saying "move it," "go, go, go," and "move the car."

63.    On almost a daily basis, and especially frequently on the weekends, Larry has told the Plaintiffs, "My car wash needs business, business, business." Sometimes, Larry has told the Plaintiffs, "Move it, make money, let's go."

64.    Larry frequently monitored the workers while on their breaks. When a worker went on a break, Larry often made eye contact with the worker, looked at his watch, and then looked back at the worker, monitoring the length of his or her break.

65.    Larry frequently consults with and gives instructions to on-site managers and employees, who then implement his directives.  By way of example only Larry frequently gives instructions to the on-site manager Marcos Ramos ("Marcos").

66.    Larry orders equipment for the car wash when needed, such as blowers, and coordinates and schedules repairs for the equipment.

67.    Larry maintains an office at the car wash for use in both managing and operating Super Shine and Defendants Engel Investments, Engel Properties, Grand Management, and Engel Gardens.

68.    Larry conducts business for his real estate business in his office at Super Shine.  By way of example only, renters come to the car wash approximately once a month to pay Larry rent for the properties they rent from him and his real estate companies.

69.    Larry regularly distributes pay to the workers both by check and in cash.

70.    Larry instructed workers to leave the car wash premises when the Department of Labor arrived to perform an inspection.

71.    Defendant Eric Engel also distributes pay to the workers.

72.    During the relevant period, Eric handwrote notes recording the number of hours a worker worked each week; the total amount of his or her weekly pay; the amount paid check; and the amount paid in cash.

73.    Eric handed these notes directly to the workers on an almost weekly basis.

74.    Eric maintains an office at the car wash, which he shares with Larry and Sam.

75.    Eric gives instructions to the workers.

76.    By way of example only, Eric tells the workers on the weekends, "I want 500 cars today" and "hurry up."

77.    Eric frequently consults with and gives instructions to on-site managers and employees, who then implement his directives.  By way of example only, Eric often gives instructions to Marcos.

78.     During the relevant period, Defendant Sam Engel frequently gave the workers instructions as well.  By way of example only, Sam has told the workers, "Move the f***ing line," referring to the line of cars waiting to be washed.

79.     Sam also instructed workers to lie to the Department of Labor when asked about how many hours they worked.

80.     Sam would prepare envelopes containing payments, for Eric to then distribute to the workers.

81.     When a customer complained, usually Larry, Sam, or Eric would respond to the customer and speak with a worker, if needed.

82.     In sum, the Individual Defendants have exercised complete domination and control over the Corporate Defendants.

83.     Upon information and belief, Defendants operate out of a centralized corporate office, located on the premises of Super Shine Car Wash.

84.     Defendants are joint employers of Plaintiffs under the FLSA.

85.     All Corporate Defendants constitute a single integrated enterprise majority-owned, operated and controlled by the Individual Defendants.

86.     Upon information and belief, at all relevant times, Super Shine and the Individual Defendants acted as Plaintiffs' employers, within the meaning contemplated pursuant to 29 U.S.C. § 203(d), N.J.S.A. §§ 34:11-56a1.

87.     Upon information and belief, at all relevant times, Plaintiffs were and are employees of Super Shine and the Individual Defendants, within the meaning contemplated pursuant to 29 U.S.C. § 203(e) and the N.J.S.A. §§ 34:11-56a1.

88.    Upon information and belief, at all relevant times, the activities of Super Shine itself and Defendants collectively constituted an "enterprise," within the meaning of Sections 3(r) and 3(s) of the FLSA, 29 U.S.C. §§ 203(r), (s).

89.    Upon information and belief, the Corporate Defendants are each and collectively an "enterprise engaged in commerce" within the meaning contemplated pursuant to 29 U.S.C. § 201 *et seq.*, and the cases interpreting it.

90.    Upon information and belief, Super Shine and the Individual Defendants managed and exercised control over Named Plaintiffs, either directly or through agents.

91.    Upon information and belief, many of the Plaintiffs regularly were required to perform work for Super Shine and the Individual Defendants without receiving proper minimum wages as required by applicable New Jersey law.

92.    Upon information and belief, Plaintiffs regularly were required to perform work for Super Shine and the Individual Defendants without receiving overtime compensation as required by applicable federal and New Jersey law.

93.    Plaintiffs regularly were required to perform "off-the-clock" work for Super Shine and the Individual Defendants after the official closing time of Super Shine and were not paid for their post-shift work as required by applicable federal and New Jersey law.

94.    The payments made to Plaintiffs by Super Shine and the Individual Defendants constitute "wages" as that term is defined under 29 U.S.C. § 203(m) and the N.J.S.A. §§ 34:11-56a1.

95.    Upon information and belief, Super Shine and the Individual Defendants willfully disregarded and purposefully evaded recordkeeping requirements of the FLSA and the NJWHL by failing to maintain proper and complete timesheets or payroll records.

96.     As part of their regular business practices, Super Shine and the Individual Defendants intentionally, willfully, and repeatedly have engaged in a policy, pattern, and/or practice of violating the FLSA and the NJWHL.  This policy, pattern, and/or practice has included but is not limited to:

   a.  Failing to pay Plaintiffs the proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek under the FLSA and the NJWHL;

   b.  Failing to pay many of the Plaintiffs the minimum wage under the NJWHL;

   c.  Failing to pay Plaintiffs for work they performed after the official closing time of the car wash; and

   d.  Failing to record on Plaintiffs' paystubs all hours worked in excess of 40 in a workweek in violation of the FLSA and the NJWHL.

**PLAINTIFF GEORGINA HERNANDEZ**

97.     Super Shine and the Individual Defendants employed Plaintiff Hernandez from approximately April 2018 through approximately November 23, 2019; from approximately August 29, 2020, through approximately December 28, 2020; and from approximately September 6, 2021 through approximately the first week of January 2024.

98.     Defendant Eric Engel hired Hernandez.

99.     While at times the hours worked by Hernandez varied, from approximately April 2018 through approximately November 23, 2019, Hernandez typically worked Mondays through Thursdays from approximately 8 am or 9 am through approximately 7:15 pm or 7:45 pm; Fridays to Saturdays from approximately 8 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

100.    In November and December of 2018 and November of 2019, Hernandez typically worked Mondays through Thursdays from approximately 8:00 am or 9 am through approximately 7:15 pm.

101.    From approximately November 24, 2019, through approximately August 28, 2020, Hernandez did not work at Super Shine.

102.    Hernandez returned to work at Super Shine on approximately August 29, 2020, and worked continuously until approximately December 29, 2020.

103.    During this period, Hernandez typically worked Mondays through Thursdays from approximately 8:00 am or 9 am through approximately 7:15 pm or 7:45 pm; Fridays to Saturdays from approximately 8:00 am through approximately 8:15 pm; and Sundays from approximately 8:00 am through approximately 6:15 p.m.

104.    In November and December of 2020, Hernandez typically worked Mondays through Thursdays from approximately 8:00 am or 9 pm through approximately 7:15 pm.

105.    Hernandez did not work for Defendants from approximately December 30, 2020, to approximately September 5, 2021, due to an arm injury resulting from a coworker hitting Hernandez with a car.

106.    From approximately September 6, 2021, through approximately October 2021, Hernandez worked Mondays through Thursdays from approximately 8:00 am or 9 am through approximately 7:15 pm or 7:45 pm; Fridays to Saturdays from approximately 8:00 am through approximately 8:15 pm, and Sundays from approximately 8:00 am through approximately 6:15 pm.

107.    From approximately November 2021 through approximately December 2021, Hernandez typically worked Mondays through Thursdays from approximately 8:00 am or 9 am to

approximately 7:15 pm; Fridays and Saturdays from approximately 8:00 am to approximately 8:15 pm; and Sundays from approximately 8:00 am to approximately 6:15 pm.

108.    From approximately January 2022 to approximately October 2022, Hernandez typically worked Tuesdays through Thursdays from approximately 8:00 am or 9 am to approximately 7:15 pm or 7:45 pm; Fridays and Saturdays from approximately 8:00 am to approximately 8:15 pm; and Sundays from approximately 8:00 am to approximately 6:15 pm.

109.    From approximately November 2022 through approximately December 2022, Hernandez typically worked Mondays through Thursdays from approximately 8:00 am or 9 am to approximately 7:15 pm; Fridays and Saturdays from approximately 8:00 am to approximately 8:15 pm; and Sundays from approximately 8:00 am to approximately 6:15 pm.

110.    From approximately January 2023 to approximately October 2023, Hernandez typically worked Monday through Thursdays from approximately 8:00 am or 9 am to approximately 7:15 pm or 7:45 pm; Fridays and Saturdays from approximately 8:00 am to approximately 8:15 pm; and Sundays from approximately 8:00 am to approximately 6:15 pm.

111.    From approximately late October 2023 through approximately January 2024, Super Shine and the Individual Defendants reduced Hernandez's hours to typically less than 40 hours per week.

112.    Typically, Super Shine and the Individual Defendants allowed Hernandez 15 minutes to eat lunch, and 10 minutes if the car wash were busy.

113.    Typically, Hernandez and the other workers had to work approximately 15 minutes after the official closing time to finish washing and drying the cars that had entered shortly before Super Shine's official closing time and/or to do the other tasks necessary to close the car wash.

114.    Super Shine and the Individual Defendants did not pay Hernandez or the other workers for this post-shift, off-the-clock work.

115.    Hernandez complained to Eric about not being paid for the work she and other workers had to do after the official closing time.

116.    Eric told Hernandez that he would pay her for this time, but he never did.

117.    In approximately April 2023, Hernandez did not work for a week due to an injury she sustained while cleaning the interior of a car at Super Shine.

118.    When she sustained this injury, Hernandez told Eric that she hurt her arm and asked if she could go home early.

119.    Eric told Hernandez that what "she needed was a good …. with Andre [a male co-worker]."

120.    As he said this, Eric thrust his pelvis forward and backward and moved his bent arms backwards with clenched fists, indicating sexual intercourse.

121.    Hernandez was offended by this degrading sexual comment.

122.    Hernandez objected to this comment and told Eric that she was really hurt and needed to go home early.  Eric laughed at her complaint and did not give her permission to go home early.

123.    Hernandez worked that entire day until approximately 7:15 pm or 7:45 p.m., cleaning cars with only her left hand and in extreme pain.

124.    That night Hernandez had to go to the hospital because of the extreme pain she was experiencing.

125.    About one week later, Hernandez asked Eric to sign a paper she had received from the hospital which would confirm she was working at Super Shine.

126.    Eric told Hernandez: "I'm not signing any fucking paper" and walked away.

127.    From approximately April 2018 through approximately January 2024, Larry referred to female employees as "garbage," approximately five times a month.

128.    From approximately April 2018 through approximately August 2018, Super Shine and the Individual Defendants paid Hernandez $9.50 per hour for all hours worked, except the post-shift hours she worked.

129.    From approximately September 2018 through approximately mid-March 2019, Super Shine and the Individual Defendants paid Hernandez $10.50 per hour for all the hours she worked, except her post-shift hours.  A copy of one of the documents that Super Shine typically gave Hernandez with her pay, showing that for the week ending March 17, 2019, she was paid a total of $784.88 for 74.45 hours of work, at the rate of $10.50 per hour for all hours worked, is attached hereto as **Exhibit A**.

130.    From approximately mid-March 2019 through approximately August 28, 2020, Super Shine and the Individual Defendants paid Hernandez $11.95 per hour for all hours worked, except her post-shift hours.

131.    From approximately August 29, 2020 through approximately December 29, 2020, Super Shine and the Individual Defendants paid Hernandez $13 per hour for all hours worked, except her post-shift hours.

132.    From approximately September 6, 2021 through approximately January 16, 2022, Super Shine and the Individual Defendants paid Hernandez $13.00 for all hours worked, except her post-shift hours.

133.    From approximately January 17, 2022, through approximately December 2022, Super Shine and the Individual Defendants paid Hernandez $13.50 for all hours worked, except her post-shift hours.

134.    From approximately January 2023 through approximately through approximately April 2023, Super Shine and the Individual Defendants paid Hernandez $14.00 for all hours worked, except her post-shift hours.

135.    From approximately May 2023 through approximately August 2023, Super Shine and the Individual Defendants paid Hernandez $14.75 for all hours worked, except her post-shift hours.

136.     From approximately September 2023 through approximately January 2024 Super Shine and the Individual Defendants paid Hernandez $15.25 for all hours worked, except her post-shift hours.

137.    From approximately April 2018 through approximately October 2023, Super Shine and the Individual Defendants paid Hernandez in part by check and in part in cash.  A copy of a number of the papers given to Hernandez along with her weekly pay in approximately 2021 and 2022, which show the total number of hours worked that week, the total amount of pay, the amount paid by check and the amount paid in cash, is attached hereto as **Exhibit B**.

138.    From approximately late October 2023, through approximately mid-January 2024, Super Shine and the Individual Defendants paid Hernandez by check.

139.    Super Shine and the Individual Defendants paid Hernandez solely by check when they reduced her hours to below 40 hours per week.

140.    Super Shine and the Individual Defendants typically paid Hernandez by check for 40 hours of work or less.

141.    Super Shine and the Individual Defendants typically paid Hernandez in cash for the hours she worked over 40 per week, except the post-shift hours she worked.

142.    Super Shine and the Individual Defendants paid Hernandez her regular hourly rate for all the hours she worked over 40 per week, except the post-shift hours she worked.

143.    Super Shine and the Individual Defendants failed to pay Hernandez the proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek.

144.    Typically, Larry, Eric or Sam handed Hernandez her pay.

145.    Super Shine and the Individual Defendants failed to provide accurate and complete paystubs to Hernandez as mandated by law.

146.    Throughout her employment with Super Shine and the Individual Defendants, they failed to maintain accurate records, including records of pay and timekeeping records.

147.    On a regular basis, Defendant Larry Engel gave instructions to Hernandez about her work at the car wash.

148.    For example, on many occasions Larry instructed Hernandez to stop working on cars and start cleaning the car wash, his office, Eric's office, Sam's office, and/or the bathroom.

149.    Larry instructed Hernandez to drive the cars at the car wash.

150.    Larry directed Hernandez to clean the interiors of cars.

151.    On a number of occasions, Hernandez saw Larry standing in the car wash and looking at his watch as she and other workers ate lunch.  She saw Larry tap his watch with his finger, indicating that she and other workers had to hurry up eating lunch and continue working.

152.    At times, when the car wash was very busy, Larry would tell Hernandez and other workers that there was no time for lunch.

153.    Eric instructed Hernandez about her work at the car wash.

154.    Eric told Hernandez that she should leave the car "perfectly clean."

155.    Eric directed Hernandez and other workers to work faster.

156.    Sam also directed Hernandez's work.

157.    For example, Sam told Hernandez and other workers to "take care of that fucking line [of cars], faster, faster, it's too long."

158.    Sam told Hernandez to "move it, move it."

159.    Sam directed Hernandez to stop working on cars and clean the car wash, bathroom and/or office.

160.    On various occasions, Sam pulled the hat Hernandez was wearing and told her: "Grandma, clean the place up for me."

161.    Sam and Eric told Hernandez that they would take her to clean the buildings they owned.

162.    When Hernandez cleaned the offices of Larry, Eric and Sam at Super Shine she saw the names of the buildings they owned in their offices at the car wash.

163.    Super Shine and the Individual Defendants retaliated against Hernandez upon learning of her intention to sue them for their unlawful pay practices in a civil suit.

164.    In approximately October 2023, Eric reduced Hernandez's hours in retaliation for her communicating with other workers about bringing a lawsuit for unpaid wages.

165.    On approximately February 14, 2024, at approximately 1:30 p.m., Eric called Hernandez, unsolicited, to intimidate and dissuade her from proceeding with the lawsuit.

166.    Eric told Hernandez that he knew she had met with a lawyer, he knew who the lawyer was, he knew the meeting was at her house and he knew everyone who had attended the meeting.

167.    Eric told Hernandez that he would make sure she would not receive "one cent" from this case and called her "stupid" for attempting to bring a case.

168.    When Hernandez asked Eric why he called her "stupid" and told her that she would not receive "one cent" from them if she took legal action, Eric intensified his efforts to intimidate and dissuade Hernandez from taking legal action.

169.    Eric sent Hernandez via WhatsApp a screenshot of an online article describing how employees could be held liable for failing to report cash payments to the IRS, which was a thinly veiled threat that she would face repercussions for Defendants' unlawful pay practices if she exposed such practices in the lawsuit.

170.    This was not the first time that the owners and management of Super Shine tried to prevent Hernandez and other workers from exercising their legal rights and reporting Super Shine's illegal pay practices.

171.    In approximately the Spring of 2019, when the Department of Labor ("DOL") was coming to inspect the car wash, Larry told Hernandez, Plaintiff Adrian Cortes and other workers that "ICE" (Immigration Customs Enforcement) was coming and that they had to leave the car wash and "go hide."

172.    Hernandez, Cortes and other workers left the car wash, waited at a nearby Dunkin Donuts for about 30 minutes and then returned to work.

173.    After the Department of Labor came to Super Shine, Sam told Hernandez and other workers that they should not talk to the DOL, if they were contacted.

174.    Sam also told Hernandez and other workers that if they did speak with the DOL they should say that they only worked 20 to 25 hours a week, no more than 25 hours per week.

**ADRIAN CORTES**

175.    Super Shine and the Individual Defendants employed Plaintiff Cortes from approximately August 2018 through approximately November 2019; and from approximately September 2021 to approximately March 12, 2022.

176.    Eric hired Cortes.

177.    From approximately August 2018 through approximately February 2019, Cortes typically worked 7 days a week.

178.    While at times his hours varied, from approximately August 2018 through approximately February 2019, Cortes typically worked Mondays through Thursdays from approximately 8:00 am through approximately 7:15 pm or 7:45 pm; Fridays and Saturdays from approximately 8:00 am through approximately 8:15 pm; and Sundays from approximately 8:00 am through approximately 6:15 pm.

179.    From approximately March 2019 through approximately November 2019, Cortes typically worked 6 days a week.

180.    While at times his hours varied, during this period, Cortes typically worked Mondays through Thursdays from approximately 8:00 am through approximately 7:15 or 7:45 pm; Fridays and Saturdays from approximately 8:00 am through approximately 8:15 pm; and Sundays from approximately 8:00 am through approximately 6:15 pm.

181.    From approximately September 2021 through approximately March 12, 2022, Cortes typically worked 6 days a week.

182.    While at times his hours varied, during this period, Cortes typically worked Mondays through Thursdays from approximately 8:00 am through approximately 7:15 pm or 7:45 pm; Fridays and Saturdays from approximately 8:00 am through approximately 8:15 pm; and Sundays from approximately 8:00 am through approximately 6:15 pm.

183.    Typically, Cortes was allowed 15 minutes for lunch, and 10 minutes when the car wash was busy.

184.    Typically, Cortes and the other workers had to work approximately 15 minutes after the official closing time to finish washing and drying the cars that had entered shortly before Super Shine's official closing time and/or to do the other tasks necessary to close the car wash.

185.    Super Shine and the Individual Defendants did not pay Cortes or the other workers for this post-shift, off-the-clock work.

186.    From approximately August 2018 through approximately February 2019, Cortes worked on construction projects at buildings owned by one or more of the Defendants.

187.    Approximately two weeks after Cortes started working at Super Shine in approximately August 2018, Larry directed Cortes to perform construction-related work at one of the buildings that one or more of the Defendants owned.

188.    Thereafter, Larry would typically arrive at Super Shine at around 10 a.m. and direct Cortes to stop working at the car wash and go with him to one of the buildings owned by one or more of the Defendants to perform construction-related work.

189.    Typically, Larry would drive Cortes to the construction site in his [Larrry's] pick-up truck.

190.    At times, Eric drove Cortes from the car wash to the construction sites.

191.    From approximately August 2018 through approximately February 2019, Larry directed Cortes to stop working at the car wash and go with him to work at one the buildings owned by one or more of the Defendants approximately 2 to 3 times a week.

192.    During this period, Cortes worked on buildings in Elizabeth, New Jersey, owned by one or more of the Defendants, including, without limitation, The Grand, located at 318 W. Grand Street, The Grand at Murray, located at 57 Murray Street, The Grand at Westfield, located at 618 Westfield Avenue and The Grand at Fairmount, located at 1213-1217 Fairmount Avenue.

193.    Larry, Eric and Sam supervised Cortes' work at their construction projects.

194.    While at times his hours varied, on the days when Larry directed Cortes to work at the construction sites, Cortes typically worked from approximately 8 am to approximately 6 pm or approximately 8 am to approximately 7:15 pm or 7:45 pm.

195.    At times, Eric drove Cortes from the construction sites back to the car wash at approximately 6 pm so Cortes could continue working at the car wash after he finished working at the construction site.

196.    At times, Jefferson or Nicholas, two foremen at the construction sites who worked for Larry and Sam, would drive Cortes back to the car wash at approximately 6 pm so Cortes could continue working at the car wash.

197.    From approximately August 2018 through approximately February 2019, Super Shine and the Individual Defendants paid Cortes $750 in cash per week for all hours worked, except his post-shift hours, including hours over 40 per week.

198.    Eric told Cortes that he would be paid $750 in cash per week for all hours worked. A copy of one of documents that Super Shine typically gave Cortes with his pay, showing that for the week ending October 21, 2018, he was paid $750.00 for 76 hours and 15 minutes of work,

which amounts to $9.84 per hours for all hours worked, except his post-shift hours, is attached hereto as **Exhibit C**.

199.    During this period, Cortes was paid for his work at the construction sites and buildings owned by one or more of the Defendants in the same manner and amount as he was paid for the work he did at Super Shine.

200.    Cortes saw the tenants who lived in the buildings owned by one or more of the Defendants come to Super Shine at the end of the month to pay their rent.

201.    Cortes saw these tenants pay their rent to either the cashier at Super Shine or to Eric.

202.    From approximately March 2019 through approximately November 25, 2019, Super Shine and the Individual Defendants paid Cortes $10 per hour for all hours worked, except his post-shift hours, including hours over 40 per week.

203.    During this period, Super Shine and the Individual Defendants paid Cortes part of his pay in cash and part by check, with the cash paid on Mondays and the check paid on Tuesdays.

204.    The check Cortes received for part of his weekly pay typically listed less than 40 hours of work.

205.    Super Shine and the Individual Defendants paid Cortes in cash for the hours he worked in excess of approximately 30 to 40 hours each week, except his post-shift hours.  A copy of one of the documents that Super Shine typically gave Cortes with his pay, showing that for the week ending April 14, 2019, Super Shine paid Cortes $300 by check and $345 in cash for 64.5 hours, which amounts to $10.00 per hour for all hours worked, except his post-shift hours, is attached hereto as **Exhibit D**.

206.    In approximately 2019, Super Shine's and the Individual Defendants' failure to pay Cortes for his post-shift work caused his effective hourly rate to go below the minimum wage in New Jersey for 2019 of $10.00 per hour.

207.    From approximately September 2021 through approximately March 12, 2022, Super Shine and the Individual Defendants paid Cortes $13 per hour for all hours worked, except his post-shift hours.

208.    During this period, Super Shine and the Individual Defendants paid Cortes part of his pay in cash and part by check, with the cash paid on Mondays and the check paid on Tuesdays.

209.    The check Cortes received for part of his weekly pay typically listed less than forty hours of work.

210.    Defendants paid Cortes in cash for the hours he worked in excess of approximately 30 to 40 hours each week, except his post-shift hours.

211.    Typically, Eric handed him his pay.

212.    At times, Larry handed Cortes his pay.

213.    Larry directed Cortes' work at Super Shine.

214.    Larry told directed Cortes to move from one job at the front of the car wash and to go do another job at the back of the car wash.

215.    At times, Larry directed Cortes to mop certain areas of the car wash and to clean the bathrooms.

216.    Eric directed Cortes' work at the car wash.

217.    Eric told Cortes to drive the cars, to clean the rims of the cars' tires, to dry the cars with a blower, to mop and to vacuum the interiors of the cars, among other tasks.

218.    Sam directed Cortes' work at the Super Shine.

219.    Sam told Cortes and other workers: "Move the fucking line, move it."

220.    Sam told Cortes and other workers to work faster.

221.    Super Shine and the Individual Defendants failed to pay Cortes the proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek.

222.    Throughout his employment, Super Shine and the Individual Defendants failed to maintain accurate records, including records of pay and timekeeping records.

223.    Throughout his employment, Super Shine and the Individual Defendants failed to provide Cortes with accurate and complete paystubs.

### JOSE LUIS SANCHEZ

224.    Super Shine and the Individual Defendants employed Plaintiff Sanchez from approximately December 1, 2020 to approximately March 24, 2023.

225.    Eric hired Sanchez.

226.    Throughout his employment, Sanchez typically worked six days a week.

227.    In December 2020, Sanchez typically worked Mondays through Wednesdays from approximately 8 am through approximately 7:15 pm; Fridays and Saturdays from approximately 8 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

228.    From approximately January 2021 through approximately October 2021, Sanchez typically worked Mondays through Wednesdays from approximately 9 am through approximately 7:45 pm; Fridays and Saturdays from approximately 9 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

229.     From approximately November 2021 through approximately February 2022, Sanchez typically worked Mondays through Wednesdays from approximately 9 am through approximately 7:15 pm; Fridays and Saturdays from approximately 9 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

230.     From approximately March 2022 through approximately October 2022, Sanchez typically worked Mondays through Wednesdays from approximately 9 am through approximately 7:45 pm; Fridays and Saturdays from approximately 9 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

231.     From approximately November 2022 through approximately February 2023, Sanchez typically worked Mondays through Wednesdays from approximately 9 am through approximately 7:15 pm; Fridays and Saturdays from approximately 9 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

232.     In March 2023, typically Sanchez worked Mondays through Wednesdays from approximately 9 am through approximately 7:45 pm; Fridays and Saturdays from approximately 9 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

233.     Typically, Sanchez and the other workers typically had to work approximately 15 minutes after the official closing time to finish washing and drying the cars that had entered shortly before Super Shine's official closing time and/or to do the other tasks necessary to close the car wash.

234.     Super Shine and the Individual Defendants did not pay Sanchez or the other workers for this post-shift, off-the-clock work.

235.     Typically, Sanchez got approximately 10 to 15 minutes to eat lunch.

236.    Larry and Eric both told Sanchez that he should eat his lunch in 10 minutes.

237.    From approximately December 2020 through approximately April 2021, Defendants paid Sanchez $12 per hour in cash for all the hours he worked, except his post-shift hours, including the hours over 40 per week.

238.    In approximately 2021, Super Shine's and the Individual Defendants' failure to pay Sanchez for his post-shift work caused his effective hourly rate to go below the minimum wage in New Jersey for 2021 of $12.00 per hour.


239.    In approximately May 2021, Sanchez informed Eric that he planned to quit working at the car wash.

240.    Eric gave Sanchez a raise from $12 per hour to $14 per hour in order to convince Sanchez not to quit.

241.    From approximately May 2021 through approximately April 2022, Defendants paid Sanchez $14 per hour in cash for all the hours he worked, except his post-shift hours, including the hours over 40 per week.

242.    In approximately April 2022, Sanchez informed Eric that he planned to quit working at the car wash.

243.    Eric gave Sanchez a raise from $14 per hour to $16.50 per hour in order to convince Sanchez not to quit.

244.    From approximately May 2022 through approximately March 24, 2023, Defendants paid Sanchez approximately $16.50 per hour for all the hours he worked, except his post-shift hours, including the hours over 40 per week.

245.    After Sanchez stopped working at Super Shine in late March 2023, Eric tried to convince Sanchez to come back to work at Super Shine.

246.    In approximately July 2023, Eric and Larry came to the place where Sanchez was working at that time.

247.    Eric asked Sanchez to come back to work at Super Shine.

248.    Sanchez told Eric that he would not go back to Super Shine, "because here they pay me overtime and you're not going to pay me overtime." Eric did not respond to this comment.

249.    Eric called Sanchez on two more occasions to try to convince him to come back to work at Super Shine.

250.    In all of his efforts to get Sanchez to come back to work at Super Shine, Eric never offered to pay Sanchez overtime compensation.

251.    From approximately December 2020 through approximately April 2022, Defendants paid Sanchez solely in cash.

252.    In approximately May 2022, Defendants started to pay Sanchez in part in cash and in part in check.

253.    From approximately May 2022 through approximately March 2023, Defendants paid Sanchez for approximately 15 to 22 hours of work per week by check, and paid Sanchez in cash for all the other the hours he worked each week, except his post-shift hours.

254.    During this period, Super Shine issued Sanchez one or more paystubs along with his paychecks which listed the number of hours Sanchez worked for the week as "15," his hourly rate of "$16.50"and the amount of pay as "247.50."  A copy of one such paystub, for the week ending June 26, 2022, is attached hereto as **Exhibit E**.

255.     During this period, Super Shine also gave Sanchez, along with his weekly pay, a small, square-shaped paper listing the total number of hours he actually worked that week, the total amount of his pay, the amount paid by check and the amount paid in cash. A copy of four of these papers is attached hereto as **Exhibit F**.

256.     Each of these papers lists the amount paid by check as either "247" or "248," which, upon information and belief, corresponds to the amount of weekly pay stated on his paystubs during these weeks, and also lists the amount paid Sanchez in cash for that week.

257.     About a month after Super Shine started paying Sanchez part of his pay in check, Sanchez told Eric that he should pay all of his hours by check and pay him overtime.

258.     Eric told Sanchez: "I cannot do that."

259.     On a regular basis, Eric handed Sanchez his weekly pay.

260.     Typically, Eric handed Sanchez part of his pay in cash on Mondays and part of his pay in check Tuesdays.

261.     On some occasions, Larry handed Sanchez his pay, the cash part of his pay on Mondays and the other part of his pay in check on Tuesday.

262.     Larry would give Sanchez instructions at Super Shine, telling him to "move it" and "hurry."

263.     Sam also paid Sanchez.

264.     Sam directed the work of the workers during the week that Larry and Eric were on vacation.

265.     Sam asked Sanchez to work on his day off because the car wash was very busy, which Sanchez did.

266.    Super Shine and the Individual Defendants failed to pay Sanchez the proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek.

267.    At times, Super Shine and the Individual Defendants failed to pay Sanchez the New Jersey minimum wage.

268.    Throughout his employment, Super Shine and the Individual Defendants, failed to maintain accurate records, including records of pay and timekeeping records.

269.    Throughout his employment, Super Shine and the Individual Defendants failed to provide Sanchez with accurate and complete paystubs.

**JERSON CRUZ**

270.    Super Shine and the Individual Defendants employed Plaintiff Cruz from approximately October 15, 2022 to approximately January 31, 2024.

271.    Typically, Cruz worked six days a week for three weeks of each month, and seven days a week for one week of each month.

272.    While at times his hours varied, Cruz typically worked Mondays through Thursdays from approximately 8 am through approximately 7:15 pm or 7:45 pm; Fridays and Saturdays from approximately 8 am through approximately 8:15 pm; and Sundays from approximately 8 am through approximately 6:15 pm.

273.    Typically, Super Shine and the Individual Defendants allowed Cruz between 10 to 15 minutes for lunch.

274.    When the car wash was busy, Cruz and other workers were ordered to finish their food quickly.

275.    Typically, Cruz and the other workers typically had to work approximately 15 minutes after the official closing time to finish washing and drying the cars that had entered shortly before Super Shine's official closing time and/or to do the other tasks necessary to close the car wash.

276.    Super Shine and the Individual Defendants did not pay Cruz or the other workers for this post-shift, off-the-clock work.

277.    From approximately October 15, 2022 through approximately December 2022, Super Shine and the Individual Defendants paid Cruz $11 per hour for all hours worked, including hours over 40 per week, except his post-shift hours. The minimum wage in New Jersey in 2022 was $13.00 per hour.

278.    From approximately January 2023 through approximately March 20, 2023, Super Shine and the Individual Defendants paid Cruz $12 per hour. The minimum wage in New Jersey in 2023 was $14.13 per hour.

279.    From approximately March 21, 2023 through approximately May 2023, Super Shine and the Individual Defendants paid Cruz $13 per hour.  The minimum wage in New Jersey in 2023 was $14.13 per hour.

280.    From approximately June 2023 through approximately August 2023, Super Shine and the Individual Defendants paid Cruz $14 per hour.

281.    From approximately September 2023 through approximately January 31, 2024, Super Shine and the Individual Defendants paid Cruz $15 per hour.

282.    Cruz was given instructions by Eric, Larry and Marcos.

283.    Eric gave Cruz orders as Cruz performed his work at the car wash, including but not limited to, telling him to "hurry up, it's busy."

284.    Larry gave Cruz instructions at work, telling him that he had to work hard.

285.    On a number of occasions, Eric sent Cruz to work at a building located at 1213 Fairmount Avenue, Elizabeth, New Jersey, which was owned by one or more of the Defendants, to clean and take out the garbage.

286.    When Cruz worked at this building, he was paid at the same rate and in the same manner as he was paid when he worked at Super Shine.

287.    When Cruz worked at this building, Eric gave him orders about the work to be done via telephone.

288.    From approximately October 2022 through approximately July 2023, Super Shine and the Individual Defendants paid Cruz solely in cash.

289.    In approximately July 2023, Eric told Cruz that he would be paid for 30 hours of work by check and for the rest of his hours in cash.

290.    Typically, from approximately July 2023 through January 2024, Super Shine and the Individual Defendants paid Cruz by check for approximately 30 and 35 hours of work per week and in cash for all hours worked over 30 or 35 per week, except his post-shift hours.

291.    Typically, Eric handed Cruz his pay, the cash on Mondays and the check on Tuesdays.

292.    At times, Larry handed Cruz his pay, the cash payment on Mondays and the check on Tuesdays.

293.    In approximately 2022 and 2023, Super Shine and the Individual Defendants failed to pay Cruz the New Jersey minimum wage.

294.    Super Shine and the Individual Defendants paid Cruz his regular hourly rate for all the hours he worked over 40 hour per week.

295.    Super Shine and the Individual Defendants failed to pay Cruz the proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek.

296.    Throughout his employment, Super Shine and the Individual Defendants failed to maintain accurate records, including records of pay and timekeeping records.

297.    Throughout his employment, Super Shine and the Individual Defendants, failed to provide Plaintiff Cruz with accurate and complete paystubs.

298.    Super Shine and the Individual Defendants retaliated against Cruz in response to his complaints about their illegal deductions from his weekly pay.

299.    Super Shine and the Individual Defendants deducted approximately $980 from Cruz's weekly pay, to pay for the repair of a car that had been damaged at the car wash.

300.    The first two deductions from Cruz's weekly pay were in the amount of $100 and thereafter the deductions were $50 per week.

301.    In approximately August 2023, Cruz complained to Eric about having to pay for the damage to the car.

302.    Cruz told Eric that the company should pay because it had insurance for such things, and the car was damaged because the car wash was very busy and the workers were forced to work very quickly.

303.    Eric retaliated against Cruz in response to his complaint about the illegal deductions from his pay.

304.    In response to Cruz's complaint, Eric threatened Cruz that if he [Cruz] did not pay for the damage, he [Eric] would call the police.

305.    Eric further retaliated against Cruz. Eric told Cruz that if he did not pay for the damage to the car he would be fired.  Eric told Cruz: "If you don't pay, then you have to go home."

306.    After Super Shine and the Individual Defendants finished taking their illegal deductions from Cruz's weekly pay in December 2023, they continued to retaliate against Cruz by reducing his hours to 30 hours a week or less, thereby forcing Cruz to stop working at Super Shine in January 2024.

307.    On several occasions in January 2024, Cruz complained to Eric about the reduction in his hours, saying it was not right.

308.    During his last complaint about the reduction in his hours, which occurred on his last day at Super Shine, Eric told him his hours were reduced because he was "talking shit," which Cruz understood was a reference to his prior complaints about the illegal deductions from his pay and the retaliatory reduction of his hours.

**DELMYS AGUILAR**

309.    Super Shine and the Individual Defendants employed Plaintiff Delmys Aguilar from approximately March 1, 2022 through approximately August 1, 2023.

310.    Marcos hired Aguilar.

311.    Aguilar worked approximately 6 days a week during the first two months of her employment at Super Shine.

312.    Thereafter, Aguilar typically worked, on average, six days a week, one week a month, five days a week, two weeks a month and four days a week one week a month.

313.     While her hours varied, Aguilar typically worked Monday through Thursday from approximately 9 am through approximately 7:30 pm; Fridays from approximately 9 am to approximately 7:45 pm and Saturdays from approximately 9 am through approximately 8:15 pm; and Sundays from approximately 9 am through approximately 6:15 pm.

314.     Typically, Super Shine permitted Aguilar to take 10 to 15 minutes for lunch.

315.     Typically, Aguilar had to work approximately 15 minutes after the official closing time of the car wash on weekends to finish washing and drying the cars that had entered shortly before Super Shine's official closing time and/or to do the other tasks necessary to close the car wash.

316.     Super Shine and the Individual Defendants did not pay Aguilar for this post-shift, off-the-clock work.

317.     Marcos told Aguilar that her pay was $11 per hour.

318.     Subsequently, Eric told Aguilar that her pay was $11 per hour.

319.     For approximately the first month and a half of her employment, Defendants paid Aguilar solely in cash, at $11 per hour for all hours she worked, except for her post-shift hours.

320.     During this period, Super Shine gave Aguilar, along with her weekly pay in cash, a small square-shaped paper listing the total number of hours she worked that week (except for her post-shift hours) and the total amount of her weekly pay.  A copy of five of these papers is attached hereto as **Exhibit G**.

321.     The total weekly pay set forth on these papers divided by the total number of hours worked set forth on these papers equals $11, which is the hourly rate that Super Shine and the Individual Defendants paid Aguilar during this period for all the hours she worked (except for her post-shift hours), including those in excess of 40 per week.

322.    The minimum wage in New Jersey in 2022 was $13.00 per hour.

323.    During approximately the first month and a half of her employment, Aguilar complained to Eric about her pay, telling him that $11 per hour was very low pay.

324.    Beginning in approximately mid-April 2022, Defendants paid Aguilar in part by check and in part in cash.

325.    At this time, Defendants increased Aguilar's hourly rate from $11 to $13, but only for those hours that appeared on her check, which were always forty hours or less.

326.    For all hours over forty (except for her post-shift hours), Defendants continued to pay Aguilar $11 per hour, which was below the minimum wage of $13.00 per hour in New Jersey in 2022.

327.    From approximately mid-April 2022 through approximately December 2022, Defendants typically paid Aguilar $13 per hour by check for 40 hours of work or less.

328.    From approximately January 2023 through approximately August 1, 2023, Defendants typically paid Aguilar $14.13 per hour by check for 40 hours of work or less.

329.    Throughout Aguilar's employment, Defendants typically paid Aguilar $11 per hour in cash for all the hours she worked over 40 per week, except for her post-shift hours, which was below the minimum wage in New Jersey in 2022 of $13.00 per hour and below the minimum wage In New Jersey in 2023 of $14.13 per hour.

330.    Typically, Eric gave Aguilar her pay.

331.    Eric directed Aguilar's work and gave her instructions how to perform her work.

332.    Eric told Aguilar how she should wash the cars to make sure the cars were cleaned well; to make sure the cars were dried well; and to make sure that the cars did not leave the car wash wet.

333.    Eric directed Aguilar to "work faster," and to "keep the line moving fast."

334.    Super Shine and the Individual Defendants failed to pay Aguilar the New Jersey minimum wage.

335.    Defendants failed to pay Aguilar proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek.

336.    Super Shine and the Individual Defendants failed to maintain accurate records, including records of pay and timekeeping records.

337.    Throughout Aguilar's employment, Super Shine and the Individual Defendants failed to provide Plaintiff Aguilar with accurate or complete paystubs.

**ABELARDO PASTRANA**

338.    Super Shine and the Individual Defendants employed Plaintiff Pastrana from approximately May 7, 2022 through approximately June 5, 2022, from approximately July 5, 2022 through approximately mid-August 2023, and from approximately January 2, 2024 through the present.

339.    Eric hired Pastrana, who at the time was 17 years old.

340.    Throughout his employment with Super Shine and the Individual Defendants, Pastrana typically worked 6 days a week.

341.    While at times his hours varied, from approximately May 2022 through June 5, 2022, Pastrana typically worked 43 hours per week, on average.

342.    While at times his hours varied, from approximately July 5, 2022 through approximately mid- August 2022, Pastrana typically worked 43 hours per week, on average.

343.    While at times his hours varied, from approximately mid-August 2022 through approximately October 2022, Pastrana worked approximately more than 55 hours a week, on average.

344.    While at times his hours varied, from approximately November 2022 through approximately February 2023, Pastrana worked between approximately 35 to 40 hours a week, on average.

345.    While at times his hours varied, from approximately March 2023 through approximately mid- August 2023, Pastrana worked approximately more than 55 hours a week on average.

346.    While at times his hours varied, from approximately January 2024 through the present, Pastrana has worked approximately 56 hours per week on average.

347.    Typically, Pastrana worked approximately 15 minutes after the official closing time to finish washing and drying the cars that had entered shortly before Super Shine's official closing time and/or to do the other tasks necessary to close the car wash.

348.    Super Shine and the Individual Defendants did not pay Pastrana for this post-shift, off-the-clock work.

349.    In May 2022, Super Shine and the Individual Defendants paid Pastrana approximately $11.50 per hour for all hours worked, except his post-shift hours.  The minimum wage in New Jersey in 2022 was $13.00 per hour.

350.    From approximately July 5, 2022 through approximately April 2023, Super Shine and the Individual Defendants paid Pastrana $12 per hour for all hours worked, except his post-shift hours. The minimum wage in New Jersey in 2022 was $13.00 per hour and $14.13 in 2023.

351.    From approximately May 2023 through approximately mid-August 2023, Super Shine and the Individual Defendants paid Pastrana $14 per hour for all hours worked, except his post-shift hours.

352.    From approximately the second week of January 2024 to date Super Shine and the Individual Defendants paid Pastrana $15.13 per hour for all hours worked, except his post-shift hours.

353.    From approximately May 2022 until approximately mid-April 2023, Super Shine and the Individual Defendants paid Pastrana his regular hourly rate in cash for all the hours he worked, including the hours he worked in excess of forty per week, but not for his post-shift hours.

354.    From approximately mid-April 2023 through mid-August 2023, Super Shine and the Individual Defendants paid Pastrana by check for a maximum of 40 hours of work per week and in cash for the hours worked in excess of forty, except his post-shift hours.

355.    For approximately one or two weeks in January 2024, Super Shine and the Individual Defendants paid Pastrana by check for a maximum 40 hours of work per week and in cash for the hours worked over forty per week, except his post-shift hours.

356.    In approximately 2022 and 2023,  Super Shine and the Individual Defendants failed to pay Pastrana the New Jersey minimum wage.

357.    From May 2022 until approximately mid-January 2024, Super Shine and the Individual Defendants paid Pastrana his regular hourly rate for all the hours he worked over 40 hour per week, except his post-shift hours.

358.    From May 2022 until approximately mid-January 2024, Super Shine and the Individual Defendants failed to pay Pastrana the proper overtime compensation at the rate of one and one-half times the regular rate for work in excess of 40 hours per workweek.

359.    Typically, Eric handed Pastrana his weekly pay.

360.    Larry gave Pastrana instructions concerning his work at Super Shine. He told Pastrana to "take a towel and dry the cars."

361.    At times, Larry handed Pastrana his pay.

362.    Eric gave Pastrana instructions concerning his work at Super Shine. Among other things, Eric told Pastrana to dry the cars, clean the rims of the tires of the cars, and to clean the rugs inside cars.

363.    Super Shine and the Individual Defendants have failed to maintain accurate records, including records of pay and timekeeping.

364.    Prior to January 2024, Defendants failed to provide Pastrana with accurate and complete paystubs.

365.

366.    In approximately January 2024, Eric called Pastrana to his office at Super Shine and told Pastrana that the form of payment was going to change and that the workers would now be paid by check for all hours worked.

367.    At that time, Eric also told Pastrana that the workers would now be paid overtime.

368.    In approximately February 2024, Eric retaliated against Pastrana.

369.    Eric called Pastrana to his office at Super Shine and told him that he understood that he [Pastrana], Georgina Hernandez and other workers were in a lawsuit against him.

370.    Eric told Pastrana: "What you're doing is bad. You think you're going to get money, but the money is really for the lawyers.  Why are you doing that to me? I have been a good boss to you. I always pay you on time."

371.    Eric threatened Pastrana, telling him: "I have a better lawyer and he will make sure you pay your taxes because you've all been working with fake papers."

372.    Eric threatened Pastrana, saying: "Remember you are in this country alone, you don't have friends here."

373.    Eric asked Pastrana who was his lawyer. Pastrana told him he did not remember.

374.    Eric told Pastrana that he knew who was in the case and he mentioned a few names of workers at Super Shine.

375.    Eric then asked Pastrana who else was in the case and Pastrana told him he did not know.

376.    Eric directed Pastrana to leave the case.

377.    Eric told Pastrana: "If the lawyer calls you again, tell him you don't want to be part of the lawsuit, that you don't want to continue with that."

378.    Pastrana stayed quiet while Eric was speaking.  He was alone with Eric in his office, and he was very nervous.

379.    Pastrana felt intimidated and frightened by Eric's retaliatory threats and orders to leave the case.

## FIRST CAUSE OF ACTION
## FAIR LABOR STANDARDS ACT – UNPAID OVERTIME

380.    Plaintiffs repeat, re-allege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

381.    Super Shine, the Individual Defendants and Defendants Engel Investments, Engel Properties, Engel Homes, Grand Management, and Engel Gardens constitute and integrated enterprise and/or a single employer.

382.    Super Shine and the Individual Defendants have engaged in a widespread pattern and practice of violating the FLSA, as detailed in this complaint.

383.    The overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq*., and the supporting federal regulations, apply to Defendants and protect the FLSA Collective.

384.    Super Shine and the Individual Defendants failed to maintain proper employment records as required by the FLSA and 29 C.F.R. 516.

385.    Super Shine and the Individual Defendants willfully, knowingly, and repeatedly refused to pay the FLSA Collective overtime compensation at the statutory rate of time-and a half for all hours worked in excess of 40 hours per workweek, as required by the FLSA.

386.    Because of Super Shine's and the Individual Defendants' willful violations of the FLSA, a three-year statute of limitations applies to such violations pursuant to 29 U.S.C. § 255.

387.    In addition to Super Shine, the other Corporate Defendants are liable because they are part of an integrated enterprise and/or constitute a single employer along with Super Shine and the Individual Defendants.

388.    As a result of Super Shine's and the Individual Defendants' unlawful acts, members of the FLSA Collective have been deprived of overtime compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, as well as liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**NEW JERSEY WAGE AND HOUR LAW – UNPAID OVERTIME**

389.    Plaintiffs repeat, re-allege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

390.    Super Shine and the Individual Defendants have engaged in a widespread pattern and practice of violating the NJWHL, as detailed in this complaint.

391.    The overtime wage provisions set forth in the NJWHL apply to Defendants and protect Plaintiffs.

392.    Super Shine and the Individual Defendants failed to pay Plaintiffs overtime compensation at a rate of not less than one and one-half times the regular rate of pay for all hours worked in excess of 40 each week, as required by the NJWHL.

393.    In addition to Super Shine, the other Corporate Defendants are liable because they are part of an integrated enterprise and/or constitute a single employer along with Super Shine and the Individual Defendants.

394.    As a result of Super Shine and the Individual Defendants' unlawful acts, Plaintiffs have been deprived of overtime compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, attorneys' fees, costs, and other compensation pursuant to the NJWHL.

### THIRD CAUSE OF ACTION
### NEW JERSEY WAGE AND HOUR LAW – UNPAID MINIMUM WAGE

395.    Plaintiffs repeat, re-allege, and incorporate by reference the foregoing allegations as if set forth fully and again herein.

396.    The minimum wage provisions set forth in the NJWHL and its supporting regulations apply to Defendants and the putative class.

397.    Defendants were required to pay Plaintiffs at a rate not less than the minimum wage rate under the NJWHL for all hours worked.

398.    Super Shine and the Individual Defendants willfully failed to pay Plaintiffs the minimum wage for each hour worked.

399.    Super Shine and the Individual Defendants failed to maintain proper employment records as required by the NJWHL.

400.    In addition to Super Shine, the other Corporate Defendants are liable because they are part of an integrated enterprise and/or constitute a single employer along with Super Shine and the Individual Defendants.

401.    As a result of Super Shine's and the Individual Defendants' unlawful acts, Plaintiffs have been deprived of wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, attorneys' fees, costs, and other compensation pursuant to the NJWHL.

### FOURTH CAUSE OF ACTION
### FAIR LABOR STANDARDS ACT – RETALIATION –
### PLAINTIFFS GEORGINA HERNANDEZ, JERSON CRUZ AND ABELARDO PASTRANA

402.    Plaintiffs Hernandez, Pastrana and Cruz repeat, re-allege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

403.    Under 29 U.S.C. § 215(a)(3) of the FLSA, it is unlawful to discharge or in any other manner discriminate against an employee because that employee has complained about a violation of the employee's rights under the FLSA.

404.    As set forth above, Defendants Super Shine and Eric Engel retaliated against Plaintiffs Hernandez and Pastrana with threats and intimidation designed to dissuade and discourage them from exercising their legal rights under the FLSA.

405.    As set forth above, Defendants Super Shine and Eric Engel retaliated against Plaintiffs Hernandez and Cruz by reducing their hours, thereby forcing them to stop working at Super Shine and find work elsewhere.

406.    By retaliating against Plaintiffs Hernandez, Cruz and Pastrana, Defendants Super Shine and Eric Engel violated 29 U.S.C. § 215(a)(3).

407.    As a result of the unlawful acts of Defendants Super Shine and Eric Engel, Plaintiffs Hernandez, Cruz and Pastrana have suffered, and continue to suffer, physical, mental, emotional and economic injuries.

408.    In addition to Super Shine, the other Corporate Defendants are liable because they are part of an integrated enterprise and/or constitute a single employer along with Super Shine and the Individual Defendants.

409.    Pursuant to 29 U.S.C. § 216(b), Plaintiffs Hernandez, Cruz and Pastrana are entitled to reinstatement, payment of wages lost, as well as liquidated damages, compensatory damages, punitive damages, prejudgment interest, attorneys' fees, costs, and other compensation.

### FIFTH CAUSE OF ACTION
### NEW JERSEY WAGE AND HOUR LAW – RETALIATION
### PLAINTIFFS GEORGINA HERNANDEZ, ABELARDO PASTRANA AND
### JERSON CRUZ

410.    Plaintiffs repeat, re-allege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

411.    Under N.J.S.A. 34:11-56a24, it is unlawful to discharge or in any other manner discriminate against any employee because the employee has made any complaint to his employer that he has not been paid wages in accordance with the NJWHL.

412.    As set forth above, Defendants Super Shine and Eric Engel retaliated against Plaintiffs Hernandez, Cruz and Pastrana with threats and intimidation designed to dissuade and discourage them from exercising their legal rights under the NJWHL.

413.    As set forth above, Defendants Super Shine and Eric Engel retaliated against Plaintiffs Hernandez and Cruz by reducing their hours, thereby forcing them to stop working at Super Shine and find work elsewhere.

414.    By retaliating against Plaintiffs Hernandez, Cruz and Pastrana Defendants violated N.J.S.A. 34:11-56a24.

415.    As a result of the unlawful acts of the Defendants Super Shine and Eric Engel, Plaintiffs Hernandez, Cruz and Pastrana have suffered, and continue to suffer, physical, mental emotional and economic injuries.

416.    In addition to Super Shine, the other Corporate Defendants are liable because they are part of an integrated enterprise and/or constitute a single employer along with Super Shine and the Individual Defendants.

417.    Pursuant to N.J.S.A. 34:11-56a25, Plaintiffs Hernandez, Pastrana and Cruz are entitled to reinstatement, payment of wages lost, as well as liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation.

**SIXTH CLAIM FOR RELIEF**
**HARASSMENT ON THE BASIS OF SEX**
**UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION**
**PLAINTIFF GEORGINA HERNANDEZ**

418.    Plaintiffs repeat, re-allege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

419.    As more fully set forth above, Defendants Super Shine, Larry Engel and Eric Engel subjected Plaintiff Georgina Hernandez to harassment and a hostile work environment on the basis of her sex.

420.    Defendants Super Shine, Larry, Eric and Sam Engel maintained, participated in, approved of, condoned, ratified and failed to prevent and correct the sexual harassment and hostile work environment on the basis of sex to which Plaintiff Hernandez was subjected.

421.    The harassment, discrimination and hostile work environment on the basis of sex perpetrated against Plaintiff Hernandez was intentional and willful in nature.

422.    In addition to Super Shine, the other Corporate Defendants are liable because they are part of an integrated enterprise and/or constitute a single employer along with Super Shine and the Individual Defendants.

423.    As a result of the foregoing, Plaintiff Hernandez has suffered physical, mental, emotional, and economic injuries.

424.    Therefore, Plaintiff Hernandez is entitled to economic, compensatory, punitive damages, attorney's fees and costs and other compensation.

**SEVENTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION**

425.    Plaintiffs repeat, re-allege and incorporate by reference the foregoing allegations as if set forth fully and again herein.

426.    As set forth more fully above, Defendants Super Shine and Eric Engel by virtue of their actions and inactions, willfully created, fostered, maintained, participated in, approved of,

condoned, ratified, failed to prevent and correct, and aided and abetted, the harassment and hostile work environment on the basis of sex (female) and other unlawful conduct.

427.    As a result of the foregoing, Plaintiff Hernandez has suffered extensive physical, mental, emotional, and economic injuries.

428.    Therefore, Plaintiff Hernandez is entitled to economic, compensatory, and punitive damages, attorney's fees and costs and other compensation.

## DEMAND FOR TRIAL BY JURY

429.    Named Plaintiffs, on behalf of themselves and all others similarly situated, request a jury trial on all issues of fact and damages arising herein.

## PRAYER FOR RELIEF

WHEREFORE, the Named Plaintiffs, on behalf of themselves and all others similarly situated respectfully request that this Court grant the following relief:

(1) That, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issues such notice, to all similarly-situated persons who are presently, or have been at any time during the three years immediately preceding the filing of this suit, up through and including the date of this Court's issuance of court-supervised notice, employed by Super Shine and the Individual Defendants as non-exempt employees. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper overtime compensation as required by the FLSA;

(2) Certification of this action as a class action pursuant to FRCP Rule 23 on behalf of all members of the Putative NJ Class and the NJ Minimum Wage Subclass who have minimum wage and/or overtime claims under the NJWHL;

(3) Designation of: (i) NJ Class Representatives as representatives of the Putative NJ Class; (ii) NJ Subclass Representatives as representatives of the proposed NJ Tipped Employee Subclass; and (iii)counsel of record as Class Counsel for the proposed class and subclass; 8A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NJWHL;

(4) Appropriate equitable and injunctive relief to remedy Defendants' violations of the FLSA and the NJWHL;

(5) An award of monetary damages to be determined at trial for wages owed, unpaid overtime compensation, penalties, liquidated damages, and all other monies owed to Plaintiffs;

(6) An award of monetary damages to be determined at trial for wages owed, compensatory damages, penalties, punitive damages for retaliation against Plaintiffs Hernandez, Cruz and Pastrana;

(7) An award of monetary damages to be determined at trial for compensatory damages and punitive damages for harassment on the basis of sex against Plaintiff Hernandez;

(8) An award of prejudgment and post judgment interest;

(10) An award of attorneys' fees and costs of this action;

(11) Such other and further relief as this Court deems just and proper.


Dated: April 9, 2024
New York, New York


Respectfully submitted,

**ARENSON, DITTMAR & KARBAN**

_____ s/ Avi Mermelstein _____

By: Avi Mermelstein
420 Lexington Avenue, Suite 1402
New York, New York 10170
Tel:    (212) 490-3600
Fax:    (212) 986-1952
avi@adklawfirm.com
*Attorneys for Plaintiffs*

# EXHIBIT A

**GEORGINA GEORGINA()**

| Login Date | Login | Lunch Start | Lunch End | Logout | Regular Hours | Over Hours | Total Hours | Regular $ | Over, $ | Total, $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon, Mar 11, 2019 | 9:00 AM | | | 7:00 PM | 8h00m | 2h 00m | 10h 00m | $ 84.00 | $ 21.00 | $ 105.00 |
| Tue, Mar 12, 2019 | 8:00 AM | | | 7:00 PM | 8h00m | 3h 00m | 11h 00m | $ 84.00 | $ 31.50 | $ 115.50 |
| Wed, Mar 13, 2019 | 9:00 AM | | | 7:00 PM | 8h00m | 2h 00m | 10h 00m | $ 84.00 | $ 21.00 | $ 105.00 |
| Thu, Mar 14, 2019 | 9:00 AM | | | 7:00 PM | 8h00m | 2h 00m | 10h 00m | $ 84.00 | $ 21.00 | $ 105.00 |
| Fri, Mar 15, 2019 | 8:00 AM | | | 7:45 PM | 8h00m | 3h 45m | 11h 45m | $ 84.00 | $ 39.38 | $ 123.38 |
| Sat, Mar 16, 2019 | 8:00 AM | | | 8:00 PM | 8h00m | 4h 00m | 12h 00m | $ 84.00 | $ 42.00 | $ 126.00 |
| Sun, Mar 17, 2019 | 8:00 AM | | | 6:00 PM | 8h00m | 2h 00m | 10h 00m | $ 84.00 | $ 21.00 | $ 105.00 |

250
check
534 cash

| TOTAL BY EMPLOYEE | | | |
|---|---|---|---|
| REGULAR: | 56h 00m | / | $ 588.00 |
| OVER TIME: | 18h 45m | / | $ 196.88 |
| TOTAL: | 74h 45m | / | $ 784.88 |

# EXHIBIT B

50
650
520
130

---

Cars int
66 horas × 858
as
533

---

62 horas
837 - Total
540 - Cheque
897 Cash

GINA

---

64½
838.50
520
317

---

67
868

GINA

# EXHIBIT C

# EMPLOYEE LOGIN/LOGOUT

FROM: **10/15/18 07:00 AM**

TO:    **10/21/18 09:00 PM**



 ANDREY ANDREY()

| Login Date | Login | Lunch Start | Lunch End | Logout | Regular Hours | Over Hours | Total Hours | Regular $ | Over, $ | Total, $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon, Oct 15, 2018 | 9:00 AM | | | 7:30 PM | **8h00m** | **2h 30m** | **10h 30m** | **$ 76.80** | **$ 24.00** | **$ 100.80** |
| Tue, Oct 16, 2018 | 8:00 AM | | | 7:00 PM | **8h00m** | **3h 00m** | **11h 00m** | **$ 76.80** | **$ 28.80** | **$ 105.60** |
| Wed, Oct 17, 2018 | 8:00 AM | | | 7:00 PM | **8h00m** | **3h 00m** | **11h 00m** | **$ 76.80** | **$ 28.80** | **$ 105.60** |
| Thu, Oct 18, 2018 | 8:00 AM | | | 7:00 PM | **8h00m** | **3h 00m** | **11h 00m** | **$ 76.80** | **$ 28.80** | **$ 105.60** |
| Fri, Oct 19, 2018 | 8:00 AM | | | 8:00 PM | **8h00m** | **4h 00m** | **12h 00m** | **$ 76.80** | **$ 38.40** | **$ 115.20** |
| Sat, Oct 20, 2018 | 9:15 AM | | | 8:00 PM | **8h00m** | **2h 45m** | **10h 45m** | **$ 76.80** | **$ 26.40** | **$ 103.20** |
| Sun, Oct 21, 2018 | 8:00 AM | | | 6:00 PM | **8h00m** | **2h 00m** | **10h 00m** | **$ 76.80** | **$ 19.20** | **$ 96.00** |

**TOTAL BY EMPLOYEE**

| | | | |
|---|---|---|---|
| *REGULAR:* | *56h 00m* | / | *$ 537.60* |
| *OVER TIME:* | *20h 15m* | / | *$ 194.40* |
| *TOTAL:* | *76h 15m* | / | *$ 732.00* |

# EXHIBIT D

# EMPLOYEE LOGIN/LOGOUT

FROM: **04/08/19 07:00 AM**
TO: **04/14/19 09:00 PM**

 3boclevk. 3us cash

🖼 ANDREY ANDREY()

| Login Date | Login | Lunch Start | Lunch End | Logout | Regular Hours | Over Hours | Total Hours | Regular $ | Over, $ | Total, $ |
|---|---|---|---|---|---|---|---|---|---|---|
| Mon, Apr 08, 2019 | 8:00 AM | | | 7:00 PM | 8h00m | 3h 00m | 11h 00m | $ 80.00 | $ 30.00 | $ 110.00 |
| Wed, Apr 10, 2019 | 8:00 AM | | | 7:00 PM | 8h00m | 3h 00m | 11h 00m | $ 80.00 | $ 30.00 | $ 110.00 |
| Thu, Apr 11, 2019 | 8:00 AM | | | 7:00 PM | 8h00m | 3h 00m | 11h 00m | $ 80.00 | $ 30.00 | $ 110.00 |
| Fri, Apr 12, 2019 | 8:30 AM | | | 7:00 PM | 8h00m | 2h 30m | 10h 30m | $ 80.00 | $ 25.00 | $ 105.00 |
| Sat, Apr 13, 2019 | 8:00 AM | | | 8:00 PM | 8h00m | 4h 00m | 12h 00m | $ 80.00 | $ 40.00 | $ 120.00 |
| Sun, Apr 14, 2019 | 8:00 AM | | | 5:00 PM | 8h00m | 1h 00m | 9h 00m | $ 80.00 | $ 10.00 | $ 90.00 |

| TOTAL BY EMPLOYEE | | |
|---|---|---|
| REGULAR: | 48h 00m / | $ 480.00 |
| OVER TIME: | 16h 30m / | $ 165.00 |
| TOTAL: | 64h 30m / | $ 645.00 |

# EXHIBIT E

**Jose L Sanchez - Avalos**

| | |
|---|---|
| Company | Period Begin |
| 5203 | 6/20/2022 |
| Number | Period End |
| 78 | 6/26/2022 |
| Social Security # | Check Date |
| | 6/28/2022 |
| Hire Date | Check Number |
| 4/18/2022 | -99994113 |

Division

Branch

Department
1
Team

## Super Shine, LLC

415 N. Broad Street
Elizabeth, NJ 07208 908-377-2490

Sick Leave =4.995 HOURS

## Earnings

| Description | Location / Job | Rate | Hours/Pieces | Current | Year To Date |
|---|---|---|---|---|---|
| Regular | | 16.50 | 15.00 | 247.50 | 2475.00 |
| **Total Earnings** | | | 15.00 | 247.50 | 2,475.00 |

**NET PAY**            223.09            **Total Direct Deposits**            223.09

## Deductions

| Description | Current | Year To Date |
|---|---|---|
| Fed (T/0) (247.50) | 0.00 | 0.00 |
| OASDI (247.50) | 15.35 | 153.50 |
| Medicare (247.50) | 3.59 | 35.90 |
| NJ (A/0) (247.50) | 3.71 | 37.10 |
| NJ-EE SDI(247.50) | 0.35 | 3.50 |
| NJ-EE-FLI(247.50) | 0.35 | 3.50 |
| NJ-EE-SUI(247.50) | 0.95 | 9.50 |
| NJ-EE-WF Dev./ SWF(247.50) | 0.11 | 1.10 |
| Direct Deposit  38226XXXX | 223.09 | 2007.81 |
| Total Deductions | 247.50 | 2251.91 |
| **Check Amount** | 0.00 | 223.09 |

# EXHIBIT F

59
980
247
731

603/4
1004
347
651

PORTION IS NON-N
NEGOTIABLE • THIS
PORTION IS NON-NEG
NEGOTIABLE • THIS p
NEGO-NEG
491/2
817
248
568
THIS
NEGOTIA
PORTION IS NON-NEG
NEGOTIABLE • THIS
PORTION IS NON-NE

47
775
248
522

# EXHIBIT G

53½
588

40
440

44
484

57½
632

51½
566

Qz/ml

NON-NEGOTIABLE • THIS PORTION IS NON-NEGOTIABLE • THIS PORTION IS NON-NEGOTIABLE • THIS PORTION IS NON-NEGOTIABLE • THIS PORTION IS NON-NEGOTIABLE